Filed 1/19/23  P. v. Hubbs CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>NORMAN JAMES HUBBS,<br><br>    Defendant and Appellant. | D077636<br><br><br>(Super. Ct. No. FBABS700108) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Lorenzo R. Balderrama, Judge.  Affirmed.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Assistant Attorneys General, Steve Oetting and Heather B. Arambarri, Deputy Attorneys General for Plaintiff and Respondent.

Norman James Hubbs appeals a judgment committing him to the Department of State Hospitals in Coalinga, California for an indeterminate term for treatment and confinement as a sexually violent predator (SVP)

under the Sexually Violent Predators Act (SVPA; Welf. & Inst. Code,[1] § 6600 et seq.) following a court finding that he is an SVP.

Hubbs does not challenge the sufficiency of the evidence supporting the finding that he is an SVP. Instead, he contends: (1) the long delays in bringing his case to trial violated his due process rights; and, his counsel provided ineffective assistance by failing to file a motion to dismiss the petition based on the delays; (2) the trial court violated his due process right to counsel by denying his April 2019 *Marsden* motion (*People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*)); (3) the trial court abused its discretion by admitting into evidence "tens of thousands of pages of exhibits without addressing or evaluating [his] objections," thus violating his rights to due process and a fair trial; (4) the court erred by admitting into evidence case-specific hearsay in violation of *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*); and counsel provided ineffective assistance by failing to object to such evidence; (5) the court erred by denying his equal protection claim that the principles set forth in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) to the commitment of persons found not guilty of crimes by reason of insanity (NGI's) in Penal Code section 1026.5, subdivision (b)(7), should also apply to SVPA proceedings; and (6) there was cumulative error. We affirm.

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

FACTUAL AND PROCEDURAL BACKGROUND[2]

In July 1999, the People filed a petition to commit Hubbs as an SVP under former provisions of the SVPA. In July 2003, a jury found Hubbs to be an SVP and the trial court committed him to a state hospital for a two-year term. This court affirmed the commitment on direct appeal. (*People v. Hubbs* (Oct. 11, 2005, D043625) [nonpub. opn.] (*Hubbs 1*).) In March 2005, the People filed a petition to recommit Hubbs as an SVP under the former provisions of the SVPA. On April 13, 2006, a jury found Hubbs to be an SVP and the trial court recommitted him to a state hospital for another two-year term. On February 20, 2008, this court reversed the commitment and remanded the case for a new trial, finding that Hubbs's counsel provided ineffective assistance by failing to request funding for and timely retain defense experts. (*Hubbs 2*, *supra*, D048607.)

On March 27, 2007, the People filed another petition to recommit Hubbs as an SVP. They amended that petition to request an indeterminate term, and moved to consolidate the second and third petitions. On May 9, 2008, following this court's reversal of the 2006 judgment, the trial court granted the motion to consolidate.

Over the course of eight hearings held during 2007, Hubbs requested substitution of counsel. A new attorney, James Gass, eventually was appointed to represent Hubbs in December 2007.

In 2008, six hearings were held following this court's reversal and remand on the second petition. The People moved to consolidate the second and third petitions. Defense counsel joined in a motion on Hubbs's behalf

---

[2] This court granted Hubbs's motion to take judicial notice of the records in his prior appeals: *People v. Hubbs* (Feb. 20, 2008, D048607) (*Hubbs 2*) and *People v. Hubbs* (Dec. 19, 2014, D063955) (*Hubbs 3*), nonpublished opinions.

regarding the use of underground regulations in SVP assessment protocols, and the case was continued for that purpose.

In 2009, the trial court continued the case a number of times in an attempt to accommodate Hubbs's request that he appear at the hearings telephonically. On October 27, 2009, the People indicated they were ready for the matter to proceed to trial; however, defense counsel informed the court Hubbs wished to delay it because "he ha[d] a lawsuit pending against the county, and he [did not] want to come back to county jail until his lawsuit" was over. Both parties also stated they had not yet secured their expert witnesses. On November 3, 2009, the court set trial for February 8, 2010.

In January 2010, the court vacated the scheduled jury trial because Gass requested more time in order to secure an expert. Gass subsequently filed a motion for new evaluators in June 2010, pursuant to *In re Ronje* (2009) 179 Cal.App.4th 509, claiming he was entitled to new evaluations conducted under a valid protocol.[3] At a July 2010 hearing, the trial court granted the motion, finding Hubbs was entitled to new evaluations and a new probable cause hearing. The court found probable cause at a hearing on January 18, 2011. In December 2011, Gass stated he was not ready for trial as his request for funds to hire an expert was denied.

---

3  The court held in *In re Ronje, supra,* 179 Cal.App.4th at p. 513 that the assessment protocol used to evaluate the subjects of SVP commitment petitions was an invalid underground regulation. The appropriate remedy was to order new evaluations using a valid protocol and to conduct a new probable cause hearing based on the new evaluations. (*Id.* at p. 514.) The California Supreme Court later held "that relief arising from use of an invalid protocol in an SVP evaluation should depend on a showing that the error was material," and disapproved of *Ronje* to the extent it "omitted the materiality requirement[.]" (*Reilly v. Superior Court* (2013) 57 Cal.4th 641, 655.)

4

At a March 2012 hearing, Gass stated Hubbs had undergone multiple surgeries for hip replacements and did not want to proceed to trial until his rehabilitation was completed. The court set trial for December 2012; however, at a November 2012 status hearing, Gass stated Hubbs was still dealing with medical issues and was on an intravenous antibiotic. Gass requested the trial be continued or conducted telephonically. The People indicated readiness for trial.

In the subsequent hearings leading up to the March 2013 trial, the court continued the case for various reasons, including Gass's engagement in a murder trial and Hubbs's unwillingness to proceed to trial because of his medical issues. The court later denied Hubbs's request to delay his trial another "six or eight months."

On March 14, 2013, the matter went to trial, after which the court found Hubbs was an SVP and ordered him committed to a state hospital for an indeterminate term. Hubbs appealed. On December 19, 2014, this court reversed the recommitment, finding cumulative error rendered the 2013 trial unfair. We remanded for a new trial. (*Hubbs 3, supra,* D063955.)

In February 2015, we issued our remittitur.

In April 2015, the San Bernardino County Public Defender's Office took over Hubbs's representation and Deputy Public Defender Charlene McKinley-Powell was assigned to the case. Between August 2015 and May 2016, Hubbs executed three waivers of his speedy trial right under *People v. Litmon* (2008) 162 Cal.App.4th 383 (*Litmon*). His waivers stated: "I understand that this request may affect my rights and remedies of due process under [*Litmon*]. Specifically, I understand that I have a right to a speedy trial. However, by requesting postponement of my case, I understand that I waive my right to a speedy trial under *Litmon.* I authorize my attorney to waive time on my

5

behalf to prepare for trial and obtain witnesses and records." On August 6, 2015, Hubbs signed such a waiver agreeing to delay his hearing for six months. On January 14, 2016, he signed another such waiver delaying his hearing for three months. On May 11, 2016, Hubbs agreed to a third waiver for an "indefinite" amount of time.

On December 9, 2016, the court held a status conference and set trial for July 2017. In April 2017, McKinley-Powell told the court Hubbs had agreed that "sometime in the fall" would be a "more realistic date" and the court scheduled trial for October 2017. Between September 2017 and February 2019, the court continued Hubbs's trial date for various reasons, including McKinley-Powell's involvement in another trial and the need for updated reports and evaluations on Hubbs.

On March 19, 2019, Hubbs in a letter moved the court to dismiss the SVP petition under *People v. Superior Court* (*Vasquez*) (2018) 27 Cal.App.5th 36 (*Vasquez*).[4] He alleged he had suffered delays in bringing his case to trial

---

4    In *Vasquez*, a person was detained in state hospitals for over 17 years while awaiting a trial on an SVPA commitment petition. (*Vasquez, supra*, 27 Cal.App.5th at p. 40.) After 16 years, the trial court granted the detainee's motion to relieve the public defender's office as counsel and appointed a bar panel attorney to represent him. (*Id.* at p. 41.) Eight months later, the detainee's new counsel filed a motion to dismiss the SVPA petition for violation of the detainee's due process right to a speedy trial. (*Ibid.*) The trial court granted the motion, and the Court of Appeal upheld the dismissal. (*Vasquez, supra*, 27 Cal.App.5th at p. 41.) The appellate court concluded that although a substantial portion of the delay resulted from the failure of individual appointed attorneys to move the case forward, "the extraordinary length of the delay resulted from 'a systemic "breakdown in the public defender system," ' and must be attributed to the state." (*Ibid.*) The detainee had never objected to the many continuances of the trial date but had told his attorney he wanted to go to trial. (*Id.* at p. 62.) Although the extreme length of the delay in bringing the SVPA petition to trial (17 years) was not dispositive, it was significant that dramatic staffing cuts in the

as well as a breakdown of the public defender's system. He further stated he had spoken to McKinley-Powell about filing a *Vasquez* motion, but she had advised him that he lacked a basis because of his two prior trials. Hubbs claimed McKinley-Powell advised him that he if raised the *Vasquez* issue, she could not represent him because she would have a conflict of interest. As a result, the court might appoint a new attorney from the conflict panel, and this would not benefit him given his previous difficulties with an attorney from that panel. Hubbs alternatively requested that the court grant his *Marsden* motion and appoint a new attorney to file a *Vasquez* motion on his behalf.

On April 18, 2019, the trial court held a hearing on what the court called a "*Vasquez*/*Marsden* motion," to address Hubbs's letter. A supervising deputy public defender appeared along with McKinley-Powell and argued Hubbs did not present a valid *Vasquez* claim. The court denied Hubbs's motion, finding that a *Vasquez* motion was not appropriate because Hubbs had been brought to trial twice, he executed waivers under *Litmon, supra*, 162 Cal.App.4th 383, and his case was continued due to health issues and writ proceedings.

In February 2020, Hubbs waived his right to a jury trial.

In June 2020, the trial court found that Hubbs was an SVP and ordered him committed to a state hospital for an indeterminate term. Hubbs appeals from that order.

---

public defender's office was a cause of a substantial amount of the delay. (*Id.* at pp. 69, 77.) In addition, "the trial court failed Vasquez" by not considering whether to remove the public defender's office. (*Id.* at p. 77.)

7

## I. *Speedy Trial/Due Process Claim*

Hubbs contends: "From March 2005 through [his] March 2020 trial, his case was delayed approximately 15 years. However, if this court considers only the delay involved with [his] specific complaints, the delay still extended for nearly 10 years." He contends "the long delays caused by the prior two trials which resulted in judgments that needed to be reversed violated his due process rights . . . . Specifically, . . . the trial court . . . fail[ed] to take appropriate steps to move [his] case to trial in a timely fashion and by refusing to permit [him] to represent himself. The system by which San Bernardino County assigned attorneys to represent [him] before he was reassigned to the public defender's office suffered from a systemic breakdown because it repeatedly assigned unqualified and even incompetent attorneys to represent [him]."

Hubbs clarifies he does not allege the San Bernardino Public Defender's Office directly violated his due process rights to a speedy trial, acknowledging "their delay in bringing his case to trial was the result of the earlier delays, [his] health problems, and the normal process in bringing an SVP case to trial." He further contends his trial counsel provided ineffective assistance by failing to file a motion to dismiss the petition based upon those due process violations that had already occurred.

### A. *Applicable Law*

"Because civil commitment involves a significant deprivation of liberty, a defendant in an SVP proceeding is entitled to due process protections." (*People v. Otto* (2001) 26 Cal.4th 200, 209 (*Otto*).) "This includes the due process right to a *timely* trial." (*People v. Tran* (2021) 62 Cal.App.5th 330, 347 (*Tran*); see also *id.* at p. 347, fn. 13 ["Although the Sixth Amendment

8

right to a speedy trial and the Fourteenth Amendment due process right to a timely trial are distinct, for the purpose of our analysis they are sufficiently analogous to be treated interchangeably"].)

" 'Neither the California Supreme Court nor the United States Supreme Court has decided what test is to be applied in deciding a due process/timely trial claim in an SVP proceeding.' [Citation.] California Courts of Appeal have consistently applied the tests articulated in *Barker v. Wingo* (1972) 407 U.S. 514 (*Barker*) and *Mathews v. Eldridge* (1976) 424 U.S. 319 (*Mathews*)." (*Tran, supra*, 62 Cal.App.5th at pp. 347-348.)

The court in *Vasquez* applied the *Barker/Mathews* framework to consider claims of undue delay in the context of SVPA proceedings. (*Vasquez, supra*, 27 Cal.App.5th at p. 61 ["We conclude a 17-year delay before trial is by any measure an 'extraordinary' delay that triggers the *Barker* inquiry and weighs against the state"].) It held the trial court did not err in finding " '[t]he dysfunctional manner in which the Public Defender's Office handled Mr. Vasquez's case' " constituted a "systemic or institutional breakdown" that could not be attributed to the appellant. (*Vasquez, supra,* at p. 73.) Similarly, the court in *People v. DeCasas* (2020) 54 Cal.App.5th 785, 806-813 (*DeCasas*) applied the *Barker* test. (*DeCasas, supra*, 54 Cal.App.5th at p. 806.) It held the trial court did not err in finding the delays in bringing DeCasas's case to trial were due to "a systemic breakdown in the public defender's office." (*Id.* at p. 810; see also *People v. Landau* (2013) 214 Cal.App.4th 1, 31.)

1. Barker *Analysis*

In *Barker*, the United States Supreme Court established a balancing test to analyze criminal defendants' claims of speedy trial rights violations under the Sixth Amendment. "The *Barker* test involves a weighing of four

factors: length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." (*U.S. v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in U.S. Currency* (1983) 461 U.S. 555, 564.) These factors are "related . . . and must be considered together with such other circumstances as may be relevant." (*Barker*, *supra*, 407 U.S. at 533.) None of these four factors is a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. (*Id.* at p. 533.) "[T]hese factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." (*Ibid*.) "The burden of demonstrating a speedy trial violation under *Barker*'s multifactor test lies with the defendant." (*People v. Williams* (2013) 58 Cal.4th 197, 233 (*Williams*).)

### a. *Length of Delay*

"The first *Barker* factor, the length of the delay, encompasses a 'double enquiry.' [Citation.] 'Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from "presumptively prejudicial" delay [citation] . . . . If the accused makes this showing, the court must then consider . . . the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim.' " (*Williams*, *supra*, 58 Cal.4th at p. 234.)

We agree with Hubbs that the applicable delay is the 10-year period from 2005, when the People filed the petition, until 2015, when we issued our remittitur. Hubbs was brought to trial in 2006, and he appealed the commitment from that trial. He was brought to trial again in 2013, and he appealed the commitment from that trial. That appeal became final in early 2015. Beyond the ordinary time needed for trial and appeals, there was not

10

much delay in Hubbs's proceedings.  We therefore conclude the first *Barker* factor weighs against a finding of a due process violation.

### b.  *Reasons for Delay*

Hubbs concedes he "does not contend that any significant delays were caused by the prosecution."  He contends the trial court "was responsible for virtually all of the relevant delays."  He argues, "Prior to the first reversal, the trial court did a satisfactory job of bringing [his] case to trial in a timely fashion.  However, by proceeding with the case even after [his] trial attorney had shown up for the trial completely unprepared, the trial court caused a very significant delay.  If, instead of granting [his] *Faretta* motion [(*Faretta v. California* (1975) 422 U.S. 806)] and forcing [him] to an immediate trial, the trial court appointed a competent attorney to represent [him], this delay could have been avoided because the case would not have been reversed an appeal [*sic*] thereby delaying [his] case for several years."  Hubbs adds, "If the trial court had removed Gass when he refused to commit to working expeditiously on [his] case, it is likely that [Hubbs] would have been brought to trial sooner with a chance to actually win the trial—and, if he had not won the trial, there is a fair chance that the judgment would not have been reversed.  By failing to take action, the trial court delayed [his] case for several more years."

Hubbs argues:  "Most of the delays suffered by [him] must also be attributed to the government as a result of the systemic breakdown in the system San Bernardino County used to assign attorneys to SVP cases when the public defender's office was not available.  San Bernardino first assigned a grossly incompetent attorney who was in the process of being disbarred when [Hubbs's] case went to trial.  Next, San Bernardino erroneously assigned a second attorney over [Hubbs's] objection since he wanted to

11

represent himself. Then San Bernardino County again ignored [his] desire for self[-]representation and assigned a third attorney with no previous SVP experience who did nothing for several years."

We attribute the majority of the delay to Hubbs, based on the following applicable case law: "Because 'the attorney is the [defendant's] agent when acting, or failing to act, in furtherance of the litigation,' delay caused by the defendant's counsel is also charged against the defendant. [Citation.] The same principle applies whether counsel is privately retained or publicly assigned." (*Vermont v. Brillon* (2009) 556 U.S. 81, 90-91, fn. omitted.) However, "[t]he general rule attributing to the defendant delay caused by assigned counsel is not absolute. Delay resulting from a systemic 'breakdown in the public defender system,' [citation], could be charged to the State." (*Id.* at p. 94.)

In *Williams*, the California Supreme Court found that "most of the delay in this case, apart from the periods already attributed to defendant, resulted from defense counsel's failure to make progress in preparing defendant's case" (*Williams*, *supra*, 58 Cal.4th at p. 244), but concluded the delay must be charged to the defendant absent evidence in the record demonstrating a systemic breakdown in the public defender system (*id.* at p. 247). It observed that "the record on appeal contains no facts that affirmatively support [a systemic breakdown in the system]. Because defendant did not file a motion to dismiss on speedy trial grounds in the trial court, the underlying cause of the delay in this case was never litigated, the various statements by defendant and his attorneys were never examined in an adversarial proceeding, and the trial court made no findings that might inform the issue before us." (*Id.* at p. 248.)

Similarly, in *Tran*, decided after *Vasquez, supra,* 27 Cal.App.5th 36 and *DeCasas, supra,* 54 Cal.App.5th 785, the court held that "[w]ithout a more developed factual record, we cannot make a determination whether the defense delays were justifiable, or 'whether the lack of progress was attributable to each attorney's own inability to properly manage or prioritize his or her caseload, or whether the performance of individual attorneys was indicative of unreasonable resource constraints, misallocated resources, inadequate monitoring or supervision, or other systemic problems.' [Citation.] Accordingly, we must attribute all delays caused by defense counsel to defendant." (*Tran, supra,* 62 Cal.App.5th at p. 352.)

The record here is also undeveloped, and we cannot conclusively ascertain whether the delays were caused by defense counsel's inability to handle his case load or some other cause specific to the attorney. However, absent from the record is evidence affirmatively demonstrating a systemic breakdown in the public defender system. In light of the governing law, we attribute to Hubbs the vast majority of the delays.

c. *Hubbs's Assertion of the Right to a Timely Trial*

A defendant's "assertion of or failure to assert his right to a speedy trial" is one factor to be considered in determining whether he was deprived of his right to a speedy or timely trial. (*Barker, supra,* 407 U.S. at p. 528; *Vasquez, supra,* 27 Cal.App.5th at p. 61.) A defendant's belated assertion of his right to a speedy SVP trial has less weight than a prompt assertion of that right. (*Litmon, supra,* 162 Cal.App.4th at p. 405.) "The defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." (*Barker, supra,* 407 U.S. at pp. 531-532.) " 'The issue is not simply the number of times the accused acquiesced or objected; rather, the focus is on

13

the surrounding circumstances, such as the timeliness, persistence, and sincerity of the objections, the reasons for the acquiescence, whether the accused was represented by counsel, the accused's pretrial conduct (as that conduct bears on the speedy trial right), and so forth. [Citation.] The totality of the accused's responses to the delay is indicative of whether he or she actually wanted a speedy trial.' " (*Williams*, *supra*, 58 Cal.4th at p. 238.)

Hubbs admits he "made no early assertion of his right to a speedy trial," but contends we should not weigh this factor against him. However, almost every continuance was either requested by or agreed to by Hubbs's counsel and, as discussed above, these requests must be attributed to Hubbs because there is no evidence in the record to suggest they were due to a systemic breakdown in the SVP unit. Moreover, Hubbs sought waivers under *Litmon, supra,* 162 Cal.App.4th 383. After 2016, he sought a time waiver for an indefinite period, and he at one point sought an eight-month delay, which the court denied. The burden is on Hubbs to demonstrate error. (*People v. Thompson* (2016) 1 Cal.5th 1043, 1097, fn. 11 ["On appeal, we assume a judgment is correct and the defendant bears the burden of demonstrating otherwise"].) The evidence in the record shows that Hubbs did not assert his right to a speedy trial, but rather repeatedly manifested his agreement with the continuances sought or stipulated to by his counsel. We accordingly weigh this factor against him.

d. *Prejudice to Hubbs*

Hubbs acknowledges that unlike the defendants in *DeCasas, supra,* 54 Cal.App.5th 785 and *Vasquez, supra,* 27 Cal.App.5th 36, he has had three trials. But he points out two of the trials were flawed. He argues that although the *Vasquez* court found a purpose of a speedy trial is to minimize

14

anxiety and concern of the accused (*Vasquez,* at p. 63), his "anxiety and concern were not minimized during this long delay."

"Whether [a] defendant suffered prejudice as a result of the delay must be assessed in light of the interests the speedy trial right was designed to protect: '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.' " (*Williams, supra,* 58 Cal.4th at p. 235.) "Of these forms of prejudice, 'the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.' " (*Doggett v. U.S.* (1992) 505 U.S. 647, 654.)

"[L]engthy post-deprivation pretrial delay in an SVP proceeding is oppressive. In this case, we cannot turn a blind eye to the years of pretrial confinement that have elapsed following expiration of the last ordered term of commitment." (*Litmon, supra,* 162 Cal.App.4th at p. 406; see *Barker, supra,* 407 U.S. at pp. 532-533 [" 'The time spent in jail is simply dead time' "]; accord, *Williams, supra,* 58 Cal.4th at p. 235 ["We have no difficulty concluding, even in light of the complexity of the case and the need for adequate preparation, that being jailed without a trial for seven years is 'oppressive' "].) An appellant "need not show 'a loss of witnesses, loss of evidence, or fading memories,' " to demonstrate prejudice. (*Vasquez, supra,* 27 Cal.App.5th at p. 63.) "Rather, it is the loss of time spent in pretrial custody that constitutes prejudice." (*Ibid.*)

The People rely on *United States v. McGhee* (8th Cir. 2008) 532 F.3d 733, 740, in which the court stated that "although anxiety and concern are present in every case, this alone does not demonstrate prejudice." They argue Hubbs "does not submit any evidence that his mental status changed while

he was awaiting trial, such that it would have been more advantageous to him to proceed at an earlier date."

We agree there is inherent prejudice from being confined for an extended period without a trial. But to the extent Hubbs suffered some prejudice from the delay, he has not shown it was the most serious type of prejudice relating to an inability to adequately prepare his case. Moreover, as we explain below, it does not outweigh the remaining factors.

e. *Balancing the* Barker *Factors*

The first factor (length of delay) weighs against Hubbs. The third factor (assertion of right to speedy trial) also weighs against him. For the second factor (reason for delay), we ascribe most of the responsibility for the delay to Hubbs, whose attorneys requested or agreed to almost all the continuances and did not object to the others. For the fourth factor (prejudice), we have observed there is inherent prejudice due to his lengthy confinement, but cannot say it was the egregious sort preventing him from maintaining a defense. Further, Hubbs concedes his case is distinguishable from *Vasquez, supra,* 27 Cal.App.5th 36 because he had three trials, even as he points out that we reversed two of those trials for prejudicial errors. Balancing these four factors, we conclude Hubbs has not sufficiently demonstrated a violation of his due process rights under *Barker, supra,* 407 U.S. 514.

2. *The* Mathews *Test*

*Mathews, supra,* 424 U.S. 31 "articulated a more general balancing test of three factors 'for resolving what process is constitutionally due' [citation]: (1) the private interest affected by the government action; (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards'; and

(3) the government's interest.  [Citation.]  Like the *Barker* test, the *Mathews* test 'involve[s] careful balancing of the competing interests . . . .' " (*Tran, supra*, 62 Cal.App.5th at p. 348.)

### a. *Private Interest Affected*

" 'The right to be free from involuntary confinement is fundamental and deprivation of this right requires due process.' " (*Tran, supra*, 62 Cal.App.5th at pp. 354-355.)  The People acknowledge Hubbs's "confinement constituted a significant deprivation of liberty, which required due process protection." This factor weighs in Hubbs's favor.

### b. *Risk of Erroneous Deprivation*

As set forth above, the original petition to commit Hubbs as an SVP was filed in 1999.  Following a trial, he was found to be an SVP beyond a reasonable doubt and committed to the custody of the Department of State Hospitals in 2003.  This is not an unusual circumstance, and this case is distinguishable from other cases where the courts granted a dismissal motion.  (See *In re Butler, supra*, 55 Cal.App.5th at pp. 625-626 [the defendant was detained for 13 years awaiting trial on original SVP petition]; *People v. DeCasas, supra*, 54 Cal.App.5th at pp. 789-801 [no trial during 13-year period following filing of original SVP petition]; *Vasquez, supra*, 27 Cal.App.5th at p. 40 [the defendant was detained for over 17 years awaiting trial on original SVP petition].)  Subsequent medical evaluations reported that Hubbs continued to satisfy SVP criteria and a petition to extend his commitment was subsequently filed.  (See *Tran, supra*, 62 Cal.App.5th at p. 355 ["[T]he initial SVP petition had to be supported by evaluations by mental health experts concluding that defendant met the SVP commitment criteria"].)  Thereafter, "throughout the life of the case, [Hubbs] was reevaluated numerous times to assess whether he still met the SVP criteria."

(*Ibid.*, fn. omitted.)  The risk of erroneous deprivation "was mitigated by the procedural safeguards required by the SVPA."  (*Ibid.*)

### c.  *Government's Interest*

"There is no question that 'the state has a compelling protective interest in the confinement and treatment of persons who have already been convicted of violent sex offenses, and who, as the result of current mental disorders that make it difficult or impossible to control their violent sexual impulses, represent a substantial danger of committing similar new crimes . . . .' " (*Tran*, *supra*, 62 Cal.App.5th at p. 355.)  This factor weighs against Hubbs.

### d.  *Balancing of Factors*

Substantial evidence demonstrated that "[a]ny risk of an erroneous deprivation of [Hubbs's] liberty was reasonably mitigated by the procedural requirements of the SVPA" (*Tran*, *supra*, 62 Cal.App.5th at p. 355) and "tip[ped] the scales in favor of [a] finding that [Hubbs] was provided with all the process that he was due."  (*Ibid.*)  Only the private interest affected weighed in Hubbs's favor.  Once again, we conclude that the court did not abuse its discretion when it denied Hubbs's dismissal motion.

### II.  *Ineffective Assistance of Counsel Claim*

Hubbs contends he received ineffective assistance of counsel when McKinley-Powell declined to file a motion to dismiss the petition based on *Vasquez*.  He argues she should have filed a motion to dismiss when the *Vasquez* opinion was issued in 2018 or when he later asked her to do so.  He contends McKinley-Powell should have raised a due process claim directed at the delays caused by the systemic breakdown in the San Bernardino County SVP defense system that occurred before her office assumed the case.

A defendant can prevail on an ineffective assistance of counsel claim only if he demonstrates (1) his counsel's performance was deficient, meaning it fell below an objective standard of reasonableness, and (2) it is reasonably probable that, but for counsel's deficient performance, the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694-695 (*Strickland*); *People v. Benavides* (2005) 35 Cal.4th 69, 92-93.) In considering a claim of ineffective assistance of counsel, it is not necessary to determine " 'counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' " (*In re Fields* (1990) 51 Cal.3d 1063, 1079, quoting *Strickland,* at p. 697.) " 'Surmounting *Strickland's* high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105.) And it is "particularly difficult" for a defendant to prevail on direct appeal on a claim of ineffective assistance by trial counsel. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

The California Supreme Court has "repeatedly stressed 'that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' " (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) In such a case, a claim of ineffective assistance of counsel "is more appropriately decided in a habeas corpus proceeding." (*Id.* at pp. 266-267.)

19

A. *Analysis*

Having distinguished this case from *Vasquez,* we conclude McKinley-Powell was not ineffective for declining to file a dismissal motion. As she explained to Hubbs, and the trial court agreed, there was no showing of a systemic breakdown in the San Bernardino County Public Defender's Office to justify such a motion. "A defense counsel is not required to make futile motions or to indulge in idle acts to appear competent." (*People v. Torrez* (1995) 31 Cal.App.4th 1084, 1091-1092; *People v. Beasley* (2003) 105 Cal.App.4th 1078, 1092.) Hubbs got a trial on the 2005 petition, a direct appeal resulting in a reversal of the 2005 commitment, a trial on the consolidated 2005 and 2007 petitions, and a direct appeal from the consolidated case resulting in another reversal. (*Hubbs 3, supra,* D063955.) As this court noted in a prior opinion, this period did not reflect a series of delays, but rather, the time necessary for Hubbs's petitions and related challenges to run their respective courses. (*Hubbs 3, supra,* D063955.) Moreover, Hubbs requested or stipulated to most of the continuances between 2005 and 2015. Between 2015 and 2016, Hubbs signed three waivers, acknowledging that his due process right to a timely trial might be affected by waiving time. On this record, Hubbs's counsel had a plausible reason for declining to file a motion to dismiss. We cannot conclude he received ineffective assistance of counsel on this claim.

In sum, we have concluded the court did not err in declining to dismiss the case for a due process violation using either the *Barker* or *Mathews* test. Further, any error counsel made in failing to file a dismissal motion was harmless beyond a reasonable doubt under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), as the court likely

20

would have properly denied it based on the stark differences between this case and *Vasquez*.

### III. *Marsden Claim*

In a related claim, Hubbs contends the trial court erred in denying his April 18, 2019 *Marsden* motion because it failed to recognize a conflict of interest between him and the San Bernardino County Public Defender's Office based on McKinley-Powell's refusal to file a *Vasquez* motion.

A. *Background*

As stated, Hubbs wrote a March 2019 letter requesting the court dismiss the SVP petition under *Vasquez, supra,* 27 Cal.App.5th 36 or alternatively, under *Marsden,* replace McKinley-Powell with an attorney who would file a dismissal motion.

At the *Marsden* hearing, McKinley-Powell's supervising attorney summarily opined that Hubbs had experienced "structural breakdowns" in his past legal representation; however, he concluded there was no basis for granting a dismissal motion: "[T]he issue in *Vasquez* is whether or not . . . a complete breakdown of the public defender's office structurally has impaired Mr. Hubbs's ability to get to trial. I think that Mr. Hubbs has suffered structural breakdowns. The court knows Mr. Hubbs went to trial twice with two different attorneys, twice was committed, and twice the appellate court overruled and determined and made the decision, which is quite unusual; that in both instances, Mr. Hubbs was denied effective assistance of counsel which, as the court knows, is that not only was the representation defective, the defective representation impacted the results in the two-prong *Strickland* test. So I'm empathetic to the situation Mr. Hubbs has experienced as a result of past representation."

21

The supervising attorney continued: "But most importantly, and I think this is what Mr. Hubbs has got to grapple with now, is the reason why [McKinley-Powell], one, hasn't pursued a doctor of our own and why we haven't pursued getting updates for a trial is because Mr. Hubbs has informed [her] of his serious [medical condition] that needs surgery to correct. He's no doubt in a great deal of discomfort, and there are other medical procedures that he's wanting to take advantage of from Coalinga and to do that, we can't be on the trial track. . . . Mr. Hubbs has requested that we not pursue trial because of that, and so therefore, the writ procedures, the health issues, and so on is what contributed to the delay." Based on that difference in this case from *Vasquez*, the supervising attorney concluded "there's no reason to say there's a breakdown in the Public Defender's office prohibiting the trial."

The trial court denied Hubbs's *Vasquez/Marsden* motion, telling him: "It appears to me that a *Vasquez* motion wouldn't arise given the fact that you've been tried before, there have been health issues, there's been writs done, and there have been *Litmon* motions [*sic*] previously filed."

Hubbs subsequently filed a petition for writ of mandate in this court, requesting we order the trial court to grant his *Marsden* motion. The People filed an informal response to the petition. In June 2019, we summarily denied the petition.

B. *Applicable Law*

" 'A defendant is entitled to have appointed counsel discharged upon a showing that counsel is not providing adequate representation or that counsel and defendant have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' " (*People v. Panah* (2005) 35 Cal.4th 395, 431.) It is the defendant's obligation to make " 'a

22

sustained good faith effort to work out any disagreements with counsel.' " (*People v. Clark* (2011) 52 Cal.4th 856, 913.) " '[T]he trial court need not conclude that an *irreconcilable* conflict exists if the defendant has not tried to work out any disagreements with counsel and has not given counsel a fair opportunity to demonstrate trustworthiness.' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1192.)

" 'Tactical disagreements between the defendant and his attorney do not by themselves constitute an "irreconcilable conflict." ' " (*People v. Jackson* (2009) 45 Cal.4th 662, 688.) "[T]actical disagreements between a defendant and his attorney or a defendant's frustration with counsel are not sufficient cause for substitution of counsel." (*People v. Streeter* (2012) 54 Cal.4th 205, 231.) Although the trial court must afford the defendant the opportunity to express specific reasons why he believes he is not being adequately represented, the court is not required to accept defendant's assertions of inadequate representation. (*People v. Vera* (2004) 122 Cal.App.4th 970, 979-980.)

We review the denial of a *Marsden* motion for abuse of discretion. (*People v. Streeter supra,* 54 Cal.4th at p. 230.) "Denial is not an abuse of discretion 'unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel.' " (*People v. Taylor* (2010) 48 Cal.4th 574, 599.)

C. *Analysis*

The court gave Hubbs and defense counsel ample opportunity to be heard on the *Marsden* motions. Hubbs stated that his only difficulty with McKinley-Powell was that although she had been on his case for four years, she faced a conflict of interest because she failed to bring his case to trial in a timely manner under *Vasquez, supra,* 27 Cal.App.5th 36. Defense counsel

confirmed that the reasons for the delay in going to trial related primarily to the ordinary delay in the appeals process and Hubbs's requests for continuances so that he could get medical care. Nothing in the record suggests Hubbs was otherwise dissatisfied with counsel's representation. The record here reflects Hubbs did not begin to complain about counsel, delays in going to trial, and demanding a trial until his 2019 letter, after *Vasquez's* publication. We conclude the court did not abuse its discretion in denying the motion. Counsel made a tactical decision not to file a motion to dismiss, and that did not constitute an irreconcilable conflict. "A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense." (*Ibid*.) "When a defendant chooses to be represented by professional counsel, that counsel is 'captain of the ship' and can make all but a few fundamental decisions for the defendant." (*People v. Carpenter* (1997) 15 Cal.4th 312, 376.)

After the court concluded there was no basis for dismissal under *Vasquez*, Hubbs did not demonstrate that a failure to replace counsel would substantially impair his right to effective assistance. Even if the court had erred and was required to grant Hubbs's request for a new attorney who would file a *Vasquez* motion, any error was harmless beyond a reasonable doubt under *Chapman, supra,* 386 U.S. 18, as a new attorney would not have obtained a different result for Hubbs under V*asquez, supra,* 27 Cal.App.5th 36.

### IV. *Evidentiary Claims*

Hubbs contends the court violated his due process right to a fair trial by admitting into evidence inadmissible hearsay contained in tens of thousands of pages of exhibits, without addressing or evaluating his objections. He elaborates: "The trial court's ruling caused several distinct

24

problems.  First, by failing to consider the merits of [Hubbs's] objection, the trial court admitted a massive amount of inadmissible hearsay.  Second, the trial court's ruling, considered in light of the sheer length of the exhibits, deprived [him] of any ability to know what evidence was being used against him.  Third, the sheer length of the exhibits has effectively deprived [him] of full appellate review because it was functionally impossible for [him] to file a brief identifying and analyzing each inadmissible piece of evidence, especially in just 32,000 words.  Fourth, the admission of these exhibits effectively without limitation negated the prohibition on case-specific hearsay under *Sanchez* because the expert's testimony, even when it included inadmissible hearsay, was testimony based upon documents that were admitted into evidence.  . . .  [¶]  Given the trial court's ruling, we do not know what evidence the trial court considered when deciding [his] case.  The trial court took three months to reach its decision.  This gave it time to review any, if not all, of the exhibits.  Therefore, [he] must assume that the trial court could have considered any part of any exhibit."

Hubbs specifically challenges the trial court's admission of Exhibits 1 through 7, 9 through 12, 15 and 21, arguing that although partially admissible, the documents contained inadmissible hearsay that did not fall within any hearsay exception.

A. *Background*

    1. *The Challenged Exhibits*

Exhibit 1 is Hubbs's certified record of arrest and prosecution.  Exhibit 2 is a San Bernardino Sheriff's Department certified police report.  Exhibit 3 is a certified packet of Department of Corrections and Rehabilitation

25

documents prepared under Penal Code section 969b.[5] Exhibit 4 contains Barstow Police Department reports for Hubbs's offenses. Exhibit 5 is Hubbs's probation report dated October 1991. Exhibit 6 is a certified copy of Hubbs's Indiana criminal history. Exhibit 7 is a certified copy of Hubbs's Indianapolis prior case No. CR-78-181b, pertaining to charges of child molestation of victim G.D. Exhibit 9 is a certified copy of Indianapolis prior case No. CR80-454C, pertaining to charges of child molestation of victim F.B. Exhibit 10 is a certified copy of Indianapolis prior case No. CR80-058B, pertaining to charges of child molestation against victim F.B. Exhibit 11 is a certified copy of Indianapolis prior case No. C80-429C, pertaining to Hubbs's failure to appear on the child molestation charges. Exhibit 12 includes interdisciplinary notes (IDN's) from various dates. Exhibit 15 contains Hubbs's medical records, including IDN's from various dates. Exhibit 21 includes IDN's from June 5, 2008.

2. *Trial Testimony*

At the 2020 trial, the prosecutor's experts were clinical psychologists Robert Owen and Steven Jenkins, who testified Hubbs satisfied the criteria of an SVP. Dr. Owen evaluated Hubbs nine times between 2001 and 2019, and Dr. Jenkins evaluated him in 2018 and 2019. The doctors reviewed Hubbs's criminal history, medical records and state hospital records.

Both doctors considered Hubbs's criminal history from Indiana. In 1978, Hubbs was charged with molesting a nine-year-old boy (G.D.); however,

---

5    Penal Code section 969b provides that to prove prior felony convictions or service of prison terms, "the records or copies of records of any state penitentiary, reformatory, county jail, city jail, or federal penitentiary in which such person has been imprisoned, when such records or copies thereof have been certified by the official custodian of such records, may be introduced as such evidence."

the charges were not sustained. In 1980, Hubbs was charged with sodomy and oral copulation of an 11-year-old boy (F.B.) but Hubbs pleaded guilty to misdemeanor battery.[6]

Both doctors reviewed Hubbs's state hospital records and testified he was caught concealing electronic devices, such as thumb drives, on which information could be stored. The records indicated that Hubbs was found watching movies depicting partially naked children and tortured children, and he had received numerous photographs depicting partially naked children.

Based on their interviews with Hubbs, evaluations, and assessment of his criminal background and risk scores, Drs. Owen and Jenkins opined Hubbs's pedophilia affected his volitional control and predisposed him to committing sexual offenses, and he would likely reoffend in a sexually violent predatory manner if released. They concluded he met the criteria for commitment as an SVP.

---

[6]     Exhibit 8, the transcript of G.D.'s deposition, was not admitted into evidence. Dr. Owen briefly referenced the transcript when testifying about Hubbs's criminal history from Indiana. Dr. Jenkins did not reference the transcript, but instead referenced the court record showing that Hubbs was charged with but not convicted of an offense involving G.D. Dr. Jenkins noted that he asked Hubbs about the allegations involving G.D. in his 2018 interview.

With no citation to legal authority, Hubbs argues: "Exhibit 8 was neither admitted nor admissible. Yet, it was used along with the other Indiana documents to support the claim that [he] had sexually assaulted [G.D.] This was entirely improper. An exhibit that was not introduced into evidence cannot be the basis for case-specific hearsay testimony; nor could it be properly considered by the trier of fact." As Hubbs provides no evidentiary support for his claim the trial judge considered the deposition transcript in its ruling, we regard this argument as forfeited. (See Cal. Rules of Court, rule 8.204(a)(1)(B) [briefs must "support each point by argument and, if possible, by citation of authority"].)

27

Hubbs did not call any trial witnesses. In opening arguments, Hubbs's counsel clarified she was not contesting the first prong of the SVP statute dealing with Hubbs's criminal convictions: "Now, the District Attorney is going to go into detail about Mr. Hubbs's offenses. Does he have convictions for sex offenses? Yes. We're not contesting the first criterion. That's not why we're here. What we are contesting is the third criterion, 'whether or not Mr. Hubbs poses a serious and well-founded risk to reoffend in a sexually violent predator manner.'"

3. *Evidentiary Rulings*

McKinley-Powell did not object to the admission of exhibits 1 through 7, stating they were certified records admissible under state law. She did not object to exhibit 21 because it was a single IDN that was referred to and identified at trial.

With defense counsel's agreement, the court elected to treat all evidentiary objections raised in the in limine proceedings as standing objections: "I know that there will probably be some objections based on motions in limine. You're certainly free to object, of course, but . . . if you want, I can consider those objections as continuing objections, particularly as to the *Sanchez* issues, that they're continuing objections, and that further objections would be futile."

McKinley-Powell objected to exhibits 9, 10 and 11, arguing they were inadmissible because they pertained to non-qualifying offenses. The prosecutor argued that they were certified court records of Hubbs's Indiana convictions and relevant to events and victims about which Drs. Owen and Jenkins had testified. After considering both parties' arguments, the trial court admitted exhibits 9, 10 and 11.

28

McKinley-Powell also objected to exhibits 12 and 15, both of which contained IDN's. She argued that, if admitted in their entirety, exhibits 12 and 15 could contain multiple levels of inadmissible hearsay, and therefore she requested the trial court limit the exhibits to only the IDN's used during trial. The prosecutor argued that these exhibits were certified medical records obtained under subpoena, and the experts had testified about the content of the IDN's. The trial court ruled that exhibits 12 and 15 would be received into evidence "to the extent that they were testified about, and I did make notes of what the testimony is."

4. *Forfeiture as to Exhibits 1 through 7 and 21*

Evidence Code section 353 provides: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion . . . ." Thus, a " ' "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.' " (*People v. Partida* (2005) 37 Cal.4th 428, 433.) " 'The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.' " (*Id.* at p. 434.)

Additionally, " 'where evidence is in part admissible, and in part inadmissible, "the objectionable portion cannot be reached by a general objection to the entire [evidence], but the inadmissible portion must be

29

specified." ' " (*People v. Burroughs* (2016) 6 Cal.App.5th 378, 410-411 (*Burroughs*).)

As McKinley-Powell expressly stated she did not object to exhibits 1 through 7 or exhibit 21 on any ground, any evidentiary challenge to these exhibits is forfeited. Hubbs argues that his counsel's decision not to object amounted to ineffective assistance of counsel. We point out that McKinley-Powell was not asked about her tactical reasons for not objecting to exhibits 1 through 7 and 21. However, there were hearsay exceptions applicable to the certified court records from California and Indiana, and therefore, no basis for an objection. (Evid. Code, § 1280.) Evidence Code section 452.5, subdivision (b)(1) states, in part: "An official record of conviction certified in accordance with subdivision (a) of [Evid. Code, s]ection 1530 . . . is admissible under [Evid. Code, s]ection 1280 to prove the commission, attempted commission, or solicitation of a criminal offense, prior conviction, service of a prison term, or other act, condition, or event recorded by the record." Evidence Code section 452.5 "creates a hearsay exception allowing admission of qualifying court records to prove not only the fact of conviction, but also that the offense reflected in the record occurred," and the language of the provision "is clear and unambiguous." (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1460-1461 (*Duran*).) Exhibits 1 through 7 and 21 were admissible under Evidence Code section 452.5, subdivision (b): "[C]ertified records of conviction fall within the definition of official records contained in Evidence Code section 1280 (the official records exception to the hearsay rule), and are per se admissible as such." (*Duran*, at p. 1461.)

5. *Exhibits 9 through 11* (*Indiana Records*)

Hubbs contends that because no Indiana offense was a qualifying offense under the SVPA, exhibits 9 through 11 were not admissible under

30

section 6600, subdivision (a)(3). He adds: "As a result, the only information from the Indiana documents that was admissible is the fact that [he] was convicted of a misdemeanor battery in Indiana. That information could be used to prove the existence of the conviction and that [he] committed a battery on F.B. However, battery is not a sex offense. Yet, the government's witnesses and [the prosecutor] used these documents to claim that [he] committed sex offenses on both [F.B. and G.D.]. The experts testified that they were aware of the accusations against [Hubbs] from Indiana and relied upon those accusations."

Hubbs further speculates: "On this record, it appears likely that the only reason the trial court admitted into evidence these exhibits in their entirety was because of its mistaken belief that section 6600, subdivision (a)(3), extends to nonqualifying offenses." Hubbs also argues his trial counsel provided ineffective assistance by failing to object to the Indiana records on Evidence Code section 352 grounds.

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) " 'Relevant evidence' means evidence, . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) "Except as provided by law, hearsay evidence is inadmissible." (Evid. Code, § 1200,

31

subd. (b).) "Documents like reports, criminal records, hospital records, and memoranda—prepared outside the courtroom and offered for the truth of the information they contain—are usually themselves hearsay and may contain multiple levels of hearsay, each of which is inadmissible unless covered by an exception." (*People v. Yates* (2018) 25 Cal.App.5th 474, 482 (*Yates*), citing *Sanchez*, *supra*, 63 Cal.4th at p. 675.) A trial court's decision to admit or exclude evidence, along with its determination of issues concerning the hearsay rule, is reviewed for abuse of discretion and will not be disturbed on appeal unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice. (*People v. Wall* (2017) 3 Cal.5th 1048, 1069; *People v. Clark* (2016) 63 Cal.4th 522, 590.)

The certified records of charges in exhibits 9 through 11 were admissible as official court documents under Evidence Code section 1280, subdivision (a), which "recognizes an exception to the hearsay rule for writings 'made by and within the scope of duty of a public employee.' Most such documents are like business records in that they are prepared to provide a chronicle of some act or event relating to the public employee's duty." (*People v. Taulton* (2005) 129 Cal.App.4th 1218, 1225.)

As to Hubbs's ineffective assistance of counsel claim, we point out that contrary to Hubbs's argument on appeal, trial counsel did object to these records under Evidence Code section 352. Defense counsel made a blanket Evidence Code section 352 objection to all records: "[W]ith regard to the hospital records, as with all of the records I'm challenging, are that . . . they're more prejudicial than probative. There are just tons of completely irrelevant information in these records." This objection provides a reasonable explanation for counsel's decision not to further object to this testimony. As

she already objected to the evidence, any further objection would be futile in light of the court's standing order regarding the in limine objections. Further, because the trier of fact was the judge who could evaluate the evidence under the proper evidentiary law, there was even less reason for an additional objection. (*People v. Garcia* (2020) 46 Cal.App.5th 123, 171; *People v. Ochoa* (2017) 7 Cal.App.5th 575, 589, fn. 10; *People v. Rauen* (2011) 201 Cal.App.4th 421, 425; *People v. Wesson* (2006) 138 Cal.App.4th 959, 968.) "It is well settled that counsel is not ineffective in failing to make an objection when the objection would have likely been overruled by the trial court." (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 924.)

     6. *Exhibits 12 and 15* (*State Hospital Records*)

Hubbs contends that not all the documents contained in exhibits 12 and 15 were IDN's, and points to some portions of those documents that contained inadmissible hearsay. He argues, "By admitting this massive amount of hearsay, without examining the evidence in advance and actually ruling upon [his] objection, the trial court violated [his] due process rights." Citing to no aspect of the court's ruling, he contends, "The trial court must have relied on some of the inadmissible evidence in making its decision, but it is impossible to know exactly upon which documents it relied. . . . [T]he trial court relied on [the People's] description of the exhibits. [That] cannot substitute for or eliminate the judge's obligation to exercise his discretion and rule upon the admissibility of the exhibits from a position of knowledge, not ignorance. By proceeding in this fashion, the trial court abused its discretion."

The hospital records were admissible under the public records exception and the business records exception under Evidence Code sections 1271 and 1280. They were made by public employees having an official duty

33

to accurately record statements during the normal course of business, thereby providing an exception to the hearsay rule. (*People v. George* (1994) 30 Cal.App.4th 262, 273-274.)

## V. *Claim of* Sanchez *Error*

Hubbs argues the court committed *Sanchez* error: "Although the trial court recognized the applicability of *Sanchez* to this case it ruled that some case-specific hearsay would be admitted. This error was highly prejudicial, not just because it admitted a significant amount of inadmissible evidence, but also because, as a result this ruling [*sic*], [he] waived his right to a jury trial."

### A. *Background*

Hubbs moved in limine to exclude certain exhibits because they contained hearsay in violation of *Sanchez, supra,* 63 Cal.4th 665. Defense counsel specifically objected to exhibit 11, claiming it included documents from a case in which there was no arrest and no conviction; therefore it would become more prejudicial than probative under Evidence Code section 352: "Its probative value is quite minimal under the circumstances. It also would invite the trier of fact to speculate what else could be the case? What else was done? How many other victims?"

As to exhibit 9, defense counsel argued: "[W]e're dealing with several counts which were dismissed in [Hubbs's] 1991 case." "With regard to hospital records, . . . they do not qualify under the business records or official records exceptions, that—as is very thoroughly known, that Coalinga State Hospital is a forensic institution, and in fact the state evaluators are considered forensic evaluators, and something that's forensic by definition is investigatory, that it is researching and documenting in order to . . . preserve details for purposes of litigation."

34

Regarding the IDN's that documented searches of Hubbs's belongings for suspected child pornography and other contraband, defense counsel argued: "[M]ost of those searches were conducted by the hospital police . . . and there's nothing in there that can remotely be called treatment. . . . And even in the cases where a psychiatric technician or other staff perform the search, it still would be inadmissible hearsay because they're in effect acting as agents of the police when they go in there looking for evidence of, you know, criminal activity, illegal items, and not just contraband items, but specifically ones that are illegal."

The court in its ruling demonstrated its understanding of *Sanchez, supra,* 63 Cal.4th 665 and the scope of that case's exclusion of case-specific hearsay. It concluded the challenged exhibits were admissible under the following hearsay exceptions: "Evidence Code sections 1270 and 1271, official or public employee records under Evidence Code sections 1280 . . . and 1561, I believe, admission of a party opponent under Evidence Code section 1220, some spontaneous statements, Evidence Code section1240, state of mind, Evidence Code section 1250, and physical state, Evidence Code section 1251, and in particular in SVP cases under Welfare and Institutions Code section 6600[, subdivision] (a)(3), the existence of any prior conviction may be shown with documentary evidence. The details underlying the commission of an offense that led to a prior conviction, including a predatory relationship with the victim may be shown by documentary evidence[.]"

B. *Applicable Law*

"Under the SVPA, an offender who is determined to be an SVP is subject to involuntary civil commitment for an indeterminate term ' "immediately upon release from prison." ' " (*People v. Putney* (2016) 1 Cal.App.5th 1058, 1065.) To establish an offender is an SVP, the prosecution

35

must prove, beyond a reasonable doubt, the offender (1) has been convicted of a sexually violent offense against one or more victims, and (2) has a diagnosed mental disorder that makes him or her a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior. (§ 6600, subd. (a)(1).) "The SVPA is designed ' "to provide 'treatment' to mentally disordered individuals who cannot control sexually violent criminal behavior" ' and to keep them confined until they no longer pose a threat to the public." (*Putney*, at p. 1065.)

Through section 6600, the Legislature has expanded the scope of admissible hearsay in SVP proceedings. Subdivision (a)(3) of that section provides: "Conviction of one or more of the crimes enumerated in this section shall constitute evidence that may support a court or jury determination that a person is a[n] [SVP], but shall not be the sole basis for the determination. The existence of any prior convictions may be shown with documentary evidence. The details underlying the commission of an offense that led to a prior conviction, including a predatory relationship with the victim, may be shown by documentary evidence, including, but not limited to, preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the State Department of State Hospitals."

Section 6600, subdivision (a)(3) thus creates a broad hearsay exception for documentary evidence to prove the existence and details underlying the commission of the offenses leading to prior convictions and to the defendant's predatory relationship with the victim. (*Otto, supra,* 26 Cal.4th at pp. 206-207 [section 6600, subd. (a)(3) "authorizes the use of hearsay in presentence reports to show the details underlying the commission of a predicate offense"].) "By permitting the use of presentence reports at the SVP proceeding to show the details of the crime," the California Supreme Court

36

has explained, "the Legislature necessarily endorsed the use of multiple-level-hearsay statements that do not otherwise fall within a hearsay exception." (*Otto*, at p. 208.) However, portions of otherwise admissible reports containing information that does not pertain to the defendant's qualifying conviction are not made admissible by section 6600, subdivision (a)(3). (*Burroughs, supra,* 6 Cal.App.5th at pp. 410-411.)

"A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion." (Evid. Code, § 802.) Under Evidence Code section 801, subdivision (b), an expert witness may offer an opinion based on any matter, whether or not admissible, that is of a type upon which experts in the field may reasonably rely.

In *Sanchez*, the California Supreme Court explained: "Any expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so. Because the jury must independently evaluate the probative value of an expert's testimony, Evidence Code section 802 properly allows an expert to relate generally the kind and source of the 'matter' upon which his opinion rests." (*Sanchez, supra*, 63 Cal.4th at pp. 685-686.)

What an expert "*cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Sanchez, supra*, 63 Cal.4th at p. 686.) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id.* at p. 676.) "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate

37

to support the expert's opinion, the statements are hearsay." (*Id*. at p. 686.) The *Sanchez* rule regarding hearsay applies in SVP trials. (See, e.g., *People v. Roa* (2017) 11 Cal.App.5th 428, 452; *Yates, supra,* 25Cal.App.5th at p. 483.)

C. *Analysis*

 1. *Exhibits 9 Through 11*

 Hubbs's contentions regarding the admissibility of the California and Indiana court records are unavailing as they are certified copies of court records and thus properly admitted under the hearsay exception set forth in Evidence Code section 452.5, subdivision (b)(1). (*People Taulton, supra,* 129 Cal.App.4th at p. 1225; *Duran, supra,* 97 Cal.App.4th at p. 1461.)

 2. *Exhibits 12 and 15*

 As exhibits 12 and 15 consist of Hubbs's state hospital records, the IDN's therein are admissible under Evidence Code sections 1271 and 1280, the business and public records exceptions to the hearsay rule. (*People v. Nelson* (2012) 209 Cal.App.4th 698, 710; *People v. Dean* (2009) 174 Cal.App.4th 186, 197; *Bhatt v. State Dept. of Health Services* (2005) 133 Cal.App.4th 923, 929-930.)

 Hubbs contends: "Before admitting the exhibits, the trial court should have confirmed that [the prosecutor] had redacted the documents appropriately so they did not contain inadmissible material and then reviewed the redacted documents in light of McKinley-Powell's objections." However, Hubbs does not cite to the record where he requested that the court undertake that course of action, and the court's response to the request. To the contrary, as stated, his counsel requested the court limit its consideration of the records to the extent they were brought up in the experts' testimony.

 Hubbs contends four pages in exhibit 12 are not IDN's, and exhibit 15 contains "massive amounts of documents" that are not IDN's. He argues that

aside from the IDN's, the records in exhibits 12 and 15 contained inadmissible hearsay. We point out the court granted McKinley-Powell's request to limit exhibits 12 and 15 to the relevant IDN's about which the experts testified. The court specified it had made notes regarding Drs. Owen and Jenkins's testimony about the state hospital records. Hubbs fails to show that, based on the court's narrow ruling, it relied on any inadmissible evidence.

To the extent the court erred, it was an error of state law only, and Hubbs is required to establish a reasonable probability of a more favorable result absent the error under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (See *Yates*, *supra*, 25 Cal.App.5th at p. 487 [applying *Watson* standard to review claim of error in admitting expert's inadmissible hearsay testimony].) He has not done so.

Drs. Owen and Jenkins interviewed Hubbs and therefore did not base their opinions solely on documentary evidence. Rather, they were able to personally assess whether Hubbs met the SVP criteria and they relied extensively on those interviews in forming their opinions.

Furthermore, as this was a bench trial, there is little likelihood Hubbs was prejudiced by any inadmissible hearsay. (See *People v. Miranda* (2000) 23 Cal.4th 340, 351 [" 'A judge, unlike a jury, is presumed to be able to avoid the risks of prejudice' posed by testimony of limited or questionable value"]; *People v. Walkkein* (1993) 14 Cal.App.4th 1401, 1408 ["The California courts also presume that a professional jurist is capable of weighing admissible evidence without being prejudiced by extraneous matters"].) Hubbs rejects this claim: "The trial court did not understand the relevant rules of evidence. Therefore, there is no reason to assume that it properly excluded inadmissible evidence in making its decision. The trial court thought that

*Burroughs*[, *supra,* 6 Cal.App.5th 378] allowed the admission of multilevel hearsay to establish the existence of all criminal offenses, including offenses that did not result in convictions. It was not possible for the judge to recover from this error. Undoubtedly, the trial court considered, for their truth, all of the allegations against appellant, no matter how unproven they might be. The problem was compounded by the trial court's mysterious belief that it had no obligation to review exhibits before admitting them into evidence."

Hubbs adds that "in combination the two rulings meant that anything the witnesses said and any evidence that related in any way to what the witnesses said would be considered for its truth. Since the experts stated that they had reviewed [his] state hospital file and had relied on it in forming their opinions, that meant that the trial court, given its ruling, could have considered anything in the exhibits. Certainly, there is no way for [him and his] counsel, or this court to figure out which records the trial court considered."

We agree with Hubbs that the record does not permit us to identify which records or portions of the record the trial court considered. However, as we have stated, it is Hubbs's burden to show prejudicial error. Absent that showing, we must presume that official duties have been regularly performed. (Evid. Code, § 664.) This presumption applies to the actions of trial judges in admitting evidence. (See *Duran, supra,* 97 Cal.App.4th at pp. 1461-1462, fn. 5.) In light of the presumption of official duty, we conclude that any evidentiary error the court made in admitting hearsay evidence was harmless beyond a reasonable doubt under the standard set forth in both *Watson, supra*, 46 Cal.2d 818, 836 and *Chapman, supra,* 386 U.S. 18.

## VI. *Equal Protection Claim*

Hubbs contends that in light of the fact the Legislature by statute has extended confrontation clause rights to NGI's in Penal Code section 1026.5, subdivision (b)(7),[7] SVPs should have a similar right based upon equal protection principles. He relies on *Hudec v. Superior Court* (2015) 60 Cal.4th 815, 829 [recognizing a statutory right against compelled testimony in NGI commitment extension trials], *People v. Curlee* (2015) 237 Cal.App.4th 709, 712 [addressing an SVP's equal protection claim that he could not be compelled to testify in his commitment trial] and *People v. Dunley* (2016) 247 Cal.App.4th 1438, 1443 [addressing an MDO's statutory right not to be compelled to testify in commitment proceedings].)

### A. *Contentions*

Hubbs "acknowledges that the evidence admitted to establish the existence and circumstances of the qualifying offense under . . . section 6600, subdivision (a)(3), arguably would be inadmissible under *Crawford*[, *supra,* 541 U.S. 36]." He further recognizes that the California Supreme Court in *Otto, supra,* 26 Cal.4th at page 208 explained the rationale for that statute: "the Legislature apparently intended to relieve victims of the burden and trauma of testifying about the details of the crimes underlying the prior convictions. Moreover, since the SVP proceeding may occur years after the predicate offense or offenses, the Legislature may have also been responding to a concern that victims and other precipitant witnesses would no longer be available." However, Hubbs reasons that the above argument "does not apply

---

[7]    Penal Code section 1026.5, subdivision (b)(7) provides that in the case of a person committed to a state hospital, "The person shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings. All proceedings shall be in accordance with applicable constitutional guarantees."

to the application of *Crawford* to other evidence. The Legislature has expressed no preference that other evidence would be more admissible in an SVP case than in an NGI case. More importantly, the other evidence of misconduct by an alleged SVP is frequently evidence that has never resulted in a conviction. . . . Thus the Legislature did not find a compelling interest in being able to present such evidence."

Hubbs contends *Crawford* protections should apply in SVP cases: "When an evaluator writes an evaluation of an alleged SVP, that report serves very much the same purpose as a police report in a criminal case. It was not prepared for use in a criminal case, but it is still testimonial in the SVP context." He recognizes that the repercussions of his proposal are extreme: "This expansion of the *Crawford* rule hearing beyond what the criminal context is [is] necessary given the existence of a Legislatively created expansion of criminal constitutional rights into the civil commitment context. Under this analysis, appellant's confrontation/*Crawford* claim would require the exclusion of any statements elicited or made in the context of any investigation of [his] criminal behavior or SVP status. Most clearly, this analysis would exclude all evaluations prepared as part of the SVP evaluation and commitment process unless the evaluator testified. [¶] Similarly, statements elicited during the course of an investigation conducted by hospital police must be excluded because those statements would have been elicited in the course of both a criminal investigation and SVP litigation. In [this] case, *Crawford* would also implicate most of the information coming from Indiana about appellant's purported criminal activities there. [¶] The most complicated question concerns appellant's state hospital file. Because [his] ongoing status as an SVP was pending throughout his time at the state

hospital, virtually everything written about him there was testimonial in light of the upcoming litigation process."

B. *Background*

Hubbs argued in an in limine motion that "equal protection mandates that persons facing civil commitment are entitled to the statutory equivalence of rights guaranteed by the federal and state Constitutions for criminal proceedings including the equivalent Sixth Amendment right to confront and cross-examine witnesses and the requirements of *Crawford*[, *supra,* 541 U.S. 36]." The court denied the motion, finding the expert's testimony was admissible and "*Crawford* does not apply" to SVP proceedings. It did not find "an extension of the Sixth Amendment *Crawford* rights by way of equal protection."

C. *Analysis*

During the pendency of this appeal, the California Supreme Court decided *Conservatorship of Eric B.* (2022) 12 Cal.5th 1085 (*Eric B.*).[8] It addressed whether, under equal protection principles, the right to not give compelled testimony at trial that the Legislature granted by statute to those committed persons found guilty of crimes by reason of insanity should extend to those facing conservatorship due to an inability to care for themselves under the Lanterman Petris-Short Act (LPS). (*Eric B.,* at p. 1092.)

_____

[8] On this court's request, the parties provided supplemental briefing regarding the applicability of *Eric B.*, *supra*, 12 Cal.5th 1085 and *People v. Cannon* (2022) 85 Cal.App.5th 786 to this contention. In the *Cannon* case, the appellant, an SVP, contended his constitutional right to equal protection was violated by the court's failure to advise him of his right to a jury trial or to elicit his personal waiver of this right. The People conceded SVP's are similarly situated to MDO's and NGI's for purposes of the jury trial laws in question. (*Id.* at p. 796.) The court concluded the rational basis standard, governed. (*Id.* at p. 798.) The court remanded the matter for a determination of whether the disparate treatment could be constitutionally justified.

The California Supreme Court reiterated that as a matter of constitutional law, the right against compelled testimony does not apply in commitment proceedings that arise in connection with criminal charges. Citing to a United States Supreme Court case and to its own jurisprudence in *People v. Leonard* (2000) 78 Cal.App.4th 776, 792-793, the court reasoned, "the proceedings were designed only to determine the subjects' status, including the potential for danger and need of mental health treatment, and that their testimony offered reliable evidence on these issues." (*Eric B., supra,* 12 Cal.5th at pp. 1098-1099.)

The *Eric B.* court nevertheless analyzed the issue on statutory grounds and equal protection principles: " 'Because of the fundamental interests at stake, equal protection principles are often invoked in civil commitment cases to ensure that the statutory scheme applicable to a particular class of persons has not treated them unfairly in comparison with other groups with similar characteristics.' [Citation.] An equal protection analysis has two steps. ' " 'The first prerequisite . . . is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.] This initial inquiry is not whether persons are similarly situated for *all* purposes, but 'whether they are similarly situated *for purposes of the law challenged*.' " ' [Citation.] If the groups are similarly situated, the next question is whether the disparate treatment can be justified by a constitutionally sufficient state interest." (*Eric B., supra,* 12 Cal.5th at p. 1102.)

*Eric B.* concluded as to the first prong of the above test, "despite their differences, we conclude NGI's and traditional LPS conservatees 'are sufficiently similar to bring into play equal protection principles that require a court to determine " 'whether distinctions between the two groups justify

44

the unequal treatment.' " ' " (*Eric B., supra,* 12 Cal.5th at pp. 1106-1107.) Specifically, both NGI's and LPS's "are subject to involuntary confinement that could be extended indefinitely, and both are committed for the dual purposes of mental health treatment and public protections." (*Id.* at pp. 1102-1103.)

As to the next prong, the court ruled:  "Decisions from the Courts of Appeal have reached differing conclusions about the level of scrutiny appropriate for assessing claims of disparate treatment in civil commitments. [Citations.]  Because the courts below did not reach this prong of the equal protection analysis, arguments have not been well developed here concerning the proper degree of scrutiny or whether the government can demonstrate a sufficient justification for granting the testimonial privilege to NGI's but not traditional LPS conservatees." (*Eric B., supra,* 12 Cal.5th at p. 1107.)

The *Eric B.* court recognized that there was no basis for relief: "Ordinarily, we would remand to the trial court for a hearing at which the Public Guardian would have an opportunity to show why the differential treatment is constitutionally justified.  [Citation.]  However, the Court of Appeal determined the error in this case was harmless under either the state (. . . *Watson, supra,* 46 Cal.2d at p. 836) or federal (. . . *Chapman supra,* 386 U.S. at. p. 24) standard for harmless error." (*Eric B., supra,* 12 Cal.5th at p. 1107.)  The court concluded:  "Whether the government can justify its differential treatment of traditional conservatees with regard to this right must await decision in another case." (*Id.* at p. 1108.)

Likewise, here, even assuming without deciding that NGI's and SVP's are sufficiently similar for purposes of applying *Crawford* protections equally to them, we have applied the more stringent *Chapman* standard and concluded all of Hubbs's claimed errors were harmless.  We have pointed out

that he does not make a sufficiency of the evidence claim; his trial counsel conceded that she was not challenging the fact that he had prior convictions for sex offenses; and the testifying doctors examined Hubbs themselves and did not rely exclusively on any submitted evidence for their conclusions that Hubbs has a diagnosed pedophilic disorder. Accordingly, following *Eric B., supra,* 12 Cal.5th 1085 we need not remand the matter to the trial court for its determination of whether the government can justify its differential treatment.

## VII. *Cumulative Error*

Hubbs contends: "The combined prejudicial effect was significant but hard to argue specifically because [he] cannot determine in advance which allegations of error this court will endorse." He reiterates his arguments that two errors "infected the entire" case: the court's decision to allow the prosecution "to do a massive document dump instead of presenting only admissible evidence"; and his representation by a public defender who had a conflict of interest.

Under the cumulative error doctrine, while a number of errors may be harmless taken individually, their cumulative effect requires reversal. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237, disapproved on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190.)

Here, Hubbs's counsel stated she was not challenging the SVPA prong relating to the fact of his conviction. The court relied on the diagnoses and opinions of Drs. Owen and Jenkins, who diagnosed Hubbs with pedophilic disorder. They opined that, as a result, he had a mental disorder that predisposes him to committing criminal sexual acts and, if he were to be released to the community, he was likely to commit another sexually violent

46

predatory offense.  They explained the bases for their opinions.  As stated, Hubbs did not present contrary evidence.

We have considered extensively Hubbs's claims of error separately and found no prejudice; therefore, viewed cumulatively, our conclusion is the same.  "Defendant was entitled to a fair trial but not a perfect one."  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)  Hubbs was not deprived of a fair trial.

DISPOSITION

The judgment is affirmed.


O'ROURKE, J.

WE CONCUR:


HUFFMAN, Acting P. J.


DO, J.